We seem to have a small army of appellant's attorneys here. Have you agreed on an allocation of time? Yes, we have, Your Honor. I'm here representing the Environmental Protection Agency. My name is Todd Kim. We have 20 minutes. I'll be taking 11 minutes initially. At that point, we have two separate groups of interveners who would like six minutes between them. I think two different representatives of those two groups will appear before the court, and then we'll like to save the remainder for rebuttal. Okay. Good morning, and may it please the Court. My name is Todd Kim from the Department of Justice, here representing the Environmental Protection Agency. We respectfully submit that the district court erred in enjoining EPA's authorization of certain pesticide uses without accommodating the requirements of FFRA, Congress's comprehensive legislation regarding pesticides. Although the district court was certainly correct to consider the requirements of the Endangered Species Act, it should also have considered the compatible requirements of FFRA. With little analysis, the district court declined to do so. In fashioning the injunctive order at issue here, we respectfully submit that this led to reversible error in multiple related ways. First, there is no dispute that FFRA limits EPA's discretion. Under this Court's precedents, those statutory limitations are relevant in defining EPA's consultation obligations under the ESA. This Court has repeatedly held that once a license has been issued, the licensed conduct is attributable to the federal agency for Section 7 purposes only insofar as the agency retains the ability to rescind or modify the license. That is, in the words of this Court in Sierra Club v. Babbitt, to implement measures that inure to the benefit of protected species. FFRA, of course, imposes various statutory limitations before EPA can take such actions, requirements that EPA must meet before canceling or modifying an existing pesticide registration. That being the case, a district court in fashioning interim injunctive relief in an ESA suit challenging EPA actions under FFRA, similarly should not set aside pesticide registrations without first finding that the statutory prerequisites are satisfied. Most notably here, EPA cannot suspend a pesticide registration pending cancellation proceedings unless it makes a finding of imminent hazard. That is, that the continued use of the pesticide during the time required for cancellation proceedings will result, well, will be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a listed species. You don't think that was found here? I don't think so, Your Honor. The district court explicitly declined to find anything under FFRA. It said FFRA doesn't trump the ESA. We don't claim that FFRA trumps the ESA. We think instead that FFRA and the ESA. You don't think that there was a finding that what was happening was causing harm to the environment? What the district court found was that, first, EPA hadn't borne the burden to show them that these actions were non-jeopardizing. Then in the next section of the district court's opinion, it said that there was a substantial risk that some of these pesticides might pose harm to species. I think that's quite different. If you look at the district court's opinion, especially page 255 of the Joint Appendix, it specifically distinguishes the Jeopardy Standard from the Eminent Hazard Standard and says the Jeopardy Standard is broader. These are two entirely different things. I'm not quite understanding what you think had to have been shown. Is the problem that because the court was concerned about the effect of these pesticides on these fish? Correct. And so it answered it. It said that there had not been proper consultation with the relevant agency. And it entered, as I understand it, and correct me if I'm wrong, it entered an order that was quite carefully limited to the use of the pesticides in certain places. Is that wrong? No, no. Everything you've said is correct so far. Yeah. The district court was pretty careful in how it laid out the injunction. Now, you are saying that it couldn't have done that unless it found that there was a danger to the species as a whole? Or what is the, what is... That's not precisely what we're arguing. First of all, we also have to keep in mind that we have arguments regarding exhaustion of remedies in primary jurisdiction. We submit that the proper entity for making this decision in the first place was the EPA, not the district court. The EPA should have been applying its administrative procedures. The procedures that we say... If it didn't do the whole, I thought a plaintiff's case was that it hadn't done that. No, no. The plaintiff's case was about a different statute. The plaintiff's case was about the ESA, not FFRA. The plaintiffs, much like the district court, said we don't even need to consider FFRA here because the ESA provides all the necessary law. We submit that's incorrect. This Court's presence made clear that even when you're talking about an ESA statute... Your position is that FFRA is the only statute that applies. No, Your Honor. They both apply. See, that's my problem. I'm not sure that I understand the government's analysis of how these two statutes work together in a situation like this. Absolutely, Your Honor. I can try to clarify. Could you? Again, this Court's precedents make clear that the ESA's consultation obligations require agencies to do particular things. But the agency's obligations only go insofar as it retains the discretion to take measures that inure to the benefit of protected species. And this Court has affirmed that in multiple cases, including Sierra Club v. Babbitt and RDC v. Houston, the Epic case. That's undisputed, that part. Now, if we look at these cases, when we're deciding whether an agency has the discretion to take such an action, of course you have to look to the law. You have to look to the statutes that define the legal regime in which the agency is operating. So when, for instance, we talk about the NRDC v. Houston case, look at the statute. The statute said that an agency could renew water contracts under terms that the agency and the party found mutually agreeable. The Court quite recently found that in that circumstance, the agency retained the discretion to take action on behalf of the protected species. Here we have a different statute, of course. We've got the ESA and we've got FFRA. FFRA sets certain requirements before EPA can take such actions. Most notably, the eminent hazard standard. You have to meet this standard, EPA has to meet it, before it can suspend a pesticide registration pending cancellation proceedings. There are also... Do you interpret that as meaning that it has to make a finding nationally? What does that mean? Is there, it can't, there's a very localized concern here. That's right, Your Honor. And your argument seems to go to a kind of a global, there has to be some kind of, that FFRA is concerned with a global showing. Well, FFRA is certainly different. With respect to species. Right. FFRA is somewhat different from the ESA in that respect. But we respectfully submit that Congress set forth in FFRA what it intended with regard to pesticides. It set forth very clearly these substantive standards that EPA has to meet before it can take action with regard to pesticides. And we should emphasize... So is that standard that it has to show that the species as a whole is threatened, that the pesticide is going to do away with the species as a whole, or is it, I'm just not understanding what is missing here that doesn't meet that standard. Well, the district court simply didn't... Poisoning fish in particular places where there's a grave risk. The district court simply didn't even consider the standard, nor did EPA address the standard at all in the proceedings we're talking about here. So this inquiry certainly simply hasn't been done yet. It would be up to EPA in the course of the administrative processes that we think are necessary to apply the standard and decide whether or not the particular evidence of harm, whatever that may be, to the listed species... But EPA hasn't done that, has it? Well, the EPA is in the middle of undergoing the consultation pursuant to the district court's... But was it all because of the district court before that? It hadn't done anything. No, that's not true, Your Honor. I respectfully submit. I mean, there have been ongoing procedures under the FFRA registration processes. And as part of those processes, EPA does consider harm to listed species, and it does consider all the other factors that go into the FFRA registration process. So, no, it's not true that EPA hasn't been doing anything. Well, what is the harm? What is the standard that it looks to? Well, the standard it looks to are the standards that are found in FFRA. FFRA says that... Is this global? FFRA looks... First, EPA must register a pesticide, according to Congress, if certain standards are met. One of these is that there cannot be unreasonable adverse effects on the environment. Unreasonable adverse effects on the environment is defined in FFRA to include a fairly broad-ranging look at things. That's absolutely correct. But that's what Congress said. That's what Congress wanted EPA to do. I'm cutting into, at this point, the interview time, so... Okay. You can finish the sentence. Well, Congress, we respectfully submit, has set forth what it believes EPA needs to look at when it's considering what to do with regard to pesticides. We'll hear from you. Thank you, Your Honor. Good morning, Your Honors. I'm Michael Kleiss, and I'm representing the CropLife America group of intervenors, which is all but two of the intervenors, if I've got the count correct. And I was just... I would like to continue along the line of questioning that you were going through with Mr. Kim as to whether FFRA necessarily requires harm to species to be addressed on a national level. I think the answer is no. Under the definition of imminent hazard, FFRA defines imminent hazard in terms of an unreasonable hazard to the survival of a species declared in danger or threatened. So conceivably, that provides a way under FFRA to address potential harm to individual species rather than having to do it nationwide. If you've got a species that's located in a particular part of the country, as these salmon are, then the means to address that is there in FFRA. And the problem is that the district court simply ignored the fact that those processes were available to EPA and instead really made this an all ESA case. And as we have argued in our brief, there are really two other statutes. There's FFRA and there's the Administrative Procedure Act that need to be brought to bear on the extent to which the court can relieve, can provide any relief to the plaintiffs here. We are particularly concerned that... I guess the Administrative Procedure Act requires that there be some review of action, final action, doesn't it? It... Doesn't it? Yes, it does, Your Honor. What is the final action here? Well, that is the problem. The court never defined the final action because I don't think that... Is that the court's problem or is that the plaintiff's problem? Your Honor, I think that's the plaintiff's problem because their complaint is a very broad programmatic complaint that attacks really EPA's way of running its operations rather than singling out any specific action for the district court to review. And as a result, we end up with a case that even when narrowed down by the district court's ruling on standing, still involved 53 different active ingredients and 26 different species of SEM. An enormously wide-ranging case. The court entered generic... Well, what environmental cases are? Well, Your Honor, that may be, but the administrative procedure and Section 7A2 of the Endangered Species Act both refer to an agency action. Well, I understand that, but the problem here is that if the agency isn't doing what the plaintiffs say and the district court said it was required to do under the statute. So there's inaction. And there is a statutory provision for a citizen's suit. There is, Your Honor, and under the APA, there's language addressing a suit against an agency for failing to perform a mandatory duty. But the Supreme Court just this past term in the Southern Utah Wilderness Alliance case made clear that that type of case that challenges agency inaction rather than action still has to be focused on a specific action that the agency was legally bound to take and didn't take. I think there may be another problem also with your APA argument, and that is that that issue was decided a long time ago under summary judgment order, which you never appealed. And I don't think it's properly before us. Your Honor, we did appeal it, but the district court withdrew its judgment, so we didn't have a final judgment to appeal. I don't have the withdrawing. Did it reinstate the judgment later? No, it has not reinstated the judgment, Your Honor. Well, it issued the summary judgment order, right? So what are you saying? Even today there's no final judgment? There's no final judgment. So then the only appeal can be that you can take then is from the injunction, right? But the injunction is grounded in the summary judgment decision that he issued earlier. And I don't see that the injunction can be sustained. What do you mean by grounded in the summary judgment? It's based on the district court's finding in the summary judgment ruling. You mean a review of the ‑‑ this is like the second injunctive order, right? This is, yes, Your Honor. But review of that order necessarily requires review of the underlying summary judgment order, is that right? Yes, Your Honor. That's our view. Your Honor, my time is more than up, and I will pass the podium to Ms. Bud Phelan. Thank you. May it please the Court. My name is Karen Bud Phelan. I'm an attorney for the Washington Farm Bureau Federation. And this oral argument, I also am representing the Washington State Potato Commission. Our concern with this case specifically is with the injunction that the district court issued prohibiting aerial application of pesticides within 100 yards of, quote, salmon supporting waters or within 20 yards for ground application. We would agree that the courts require that an injunction be issued for violations of the ESA. That is not what our briefs have focused on at all. We would also agree that in considering injunctions under the ESA, the courts are not to consider economic harms. And we understand the court's precedent and are not challenging that. But what we are concerned with is the shape and the scope of the injunction that was issued. Just recently, this court issued a case in the High Sierra case, where the court did allow the district court to consider economics in shaping the scope of the injunction. In the High Sierra case, the court found that an injunction was warranted based on irreparable injury to the environment. But in that case, for example, the district court granted a two-year time period for the Forest Service to implement an injunction on pack animals in wilderness areas. So it gave the permittees who were relying on the Forest Service permits time to implement the injunction. The injunction in this case is completely different than the injunction, for example, in TVA v. Hill or in the Sierra Club v. Marsh case. In those cases, for example, in the Marsh case, the court did issue a permanent injunction. But in that case, all of the parties agreed that construction of the highway would damage critical habitat. And there was no other alternative for the court to consider. In TVA v. Hill, the parties consented that if the dam would have been operational, it would have flooded snail garter critical habitat. So either the dam was operational or it wasn't. There was no sort of middle ground. We don't have that kind of issue in this case. And what we have requested the court to do, and the court has refused, is to narrowly tailor the injunction particularly so it doesn't cause such economic devastation to the farmers we represent. What was the request? What modification did you want made? I wasn't quite clear on that. In the request for reconsideration, we requested, for example, that the court look at the timing of the injunction. This is an injunction that lasts all year long, whether the salmon are in the waters or not. And we suggested that there may be certain times of the year when farmers could use pesticides when salmon were not present and when there was no danger that salmon would be harmed. Were you intervenors? Yes, ma'am. At what point did you intervene? The clients that I represent intervened in the beginning with the crop life group of clients. After the first injunction order, the farmer intervenors requested that we separately represent them. So at that point is when we raised the additional issues specifically on behalf of the farmers. I'm sorry, and that was at what point? After the first injunction. First injunction, okay. Yes, ma'am. One of the other problems we see with the scope of this injunction is the court's failure to consider Section 7B. And we believe that this goes to the remedy, not necessarily to whether an injunction could be issued. For example, if you look at this court's decision in the Southwest Center for Biological Diversity case, and that case entailed livestock grazing in areas where endangered fish were, along streams where endangered fish were lived, or adjacent to those areas. The court in that case found that there was a violation of Section 7 because the Forest Service had not completed consultation. But in that case, the court simply said that that violation can, or that grazing can continue based on Section 7D, because it looked at the Forest Service management of the grazing issues under the National Forest Management Act or the Forest Service Organic Act to see that the Forest Service was taking some steps to protect endangered species. One of the issues, for example, in the Southwest Center case, was that the Forest Service and the EPA originally wanted to enjoin livestock grazing during periods of the year when the fish weren't in the streams. And the court refused to issue an injunction on that basis, saying that there's got to be some direct connection between grazing and the fish. And so it refused to enjoin livestock grazing, for example, along streams that weren't direct critical habitat for, in that case, the Spike Basin Loach Minnow. Here, there was no consideration of Section 7D. According to this injunction, the court can only be, or the injunction can only be lifted when Section 7 is completed. My final very quick point is that there's no reason for a difference. May I finish my sentence? Yes. That there's no reason for a difference between treating farmers differently than treating the urban users. The court is allowing urban users to continue to use pesticides with, quote, education, yet the farmers are enjoined from doing the exact same thing. Thank you. Thank you. We'll hear from the plaintiffs, and we'll give you two minutes on rebuttal if you wish to make a comment. May it please the court. I will direct my arguments principally to the arguments that have been raised that seek to erect obstacles to injunctive relief to remedy Section 7 violations. I will also address the propriety of the injunction that was issued. But before I turn to those arguments, I want to spend a few moments describing the evidence and the nature of the violations that gave rise to the injunction. EPA is in the midst of a reregistration process under which it is determining whether pesticide use complies with current environmental standards. For the pesticides at issue in this case, it reregistered 27, or half of them, between 1994 through 2000, and it reregistered 20 more during the pendency of this case. As part of its reregistration process, EPA conducts risk assessments, and it made findings that these pesticides are likely to result in residues in water bodies that are harmful to fish. EPA recognized that these findings required further analysis under Section 7, but it postponed that analysis until after it finalized an endangered species program that it had proposed in 1989 and that is still not final. That was the status when the district court entered summary judgment, he ordered EPA to begin the consultations, and then he issued the second injunction that imposed further injunctive relief to protect salmon during the consultation process. In answer to Judge Schroeder's question, when EPA is looking at the pesticides in that process, it is looking at them in the abstract according to its authorized uses anywhere in the country, without regard to the particular species that are in harm's way or the geography or the usage. It has found that the uses it allows will result in residues that when they interact with fish will kill fish or their food supply. And on that basis, there is a problem, and it triggers the duty to consult whenever those uses occur in a location that will interact with endangered species. That's the second stage that is what EPA had to do in response to the court's order to make its may affect determinations. I'd like to address the arguments that have been made that seek to raise the bar for injunctive relief under Section 7, and there are several arguments. First, EPA and CropLife have argued that the district court could have ordered consultations but done no more. That argument runs counter to both the Endangered Species Act and to this court's case law. The Endangered Species Act has a citizen suit provision under which this case is brought. That citizen suit provision allows courts to enjoin violations of the Act, the regulations, and to enforce the Act and the regulations. It is a broad grant of authority, and it carries with it the equitable power to stop actions that are proceeding without complying with Section 7. And that is what this Court has done and has held repeatedly in cases. The Court has held that it is often appropriate and necessary to enjoin actions from proceeding without completion of consultation. Now, here, Judge Kunawer did not enjoin the pesticide registrations in their entirety or throughout the entire range of protected salmon. Instead, he narrowly crafted the injunction to impose certain protections, and he derived those protections from biological opinion that had been issued 10 years ago by the Fish and Wildlife Service. And what the Fish and Wildlife Service did is prescribe buffers to protect aquatic species, both when it found that the uses would jeopardize the survival of those species, and even when it didn't find jeopardy, it imposed those buffers as a mitigation measure. What is the duration of this second injunction? The injunction will keep these protections in place during the consultation process. When consultation is completed, the injunction ends. We had argued that the injunction should continue until EPA implements the results of the consultation, but the judge rejected that request. So as soon as there is a biological opinion from the National Marine Fisheries Service, then the injunction would end for those pesticides. He also wrote into the injunction terminating events. There may be a new lawsuit, I guess. Well, yes. If EPA does not implement protections that are called for, there may be a new lawsuit. But the judge also had terminating events before that point when EPA makes its may-affect determinations. If EPA finds that a particular pesticide use will have no effect on a particular salmon population or that it is not likely to adversely affect that population, the injunction ends as to that particular listing area. I'd like to turn to EPA's core argument in which it urges this Court to harmonize the Endangered Species Act and FFRA. But what EPA is really arguing is that the Endangered Species Act should be made subservient to FFRA. And that argument should be rejected because it collides with the act itself, with this Court's past precedent, and with the equitable power of the Court. The act itself does not make Section 7 duties subservient to other statutory authority. The predecessor statute and competing legislative proposals would have done just that, but Congress rejected those proposals. And in TVA v. Hill, the Supreme Court cited that legislative history in its finding that Section 7 makes species protection the highest of priorities. Mr. Kim has cited to this Court's precedent in which this Court has asked whether an agency retains discretionary control over an action. This Court has asked that question to determine whether Section 7 applies. If an agency has some discretion that can inure to the benefit of the species, then the Section 7 consultation will inform its exercise of that discretion, and the agency must consult. The courts have not gone further. They have not made the agency's discretionary authority the determinant of the remedy for a Section 7 violation. By making that argument, EPA is confusing limits on the agency's authority with the Court's equitable power. A court is not limited in crafting its remedy to statutory standards and procedures that might confine the agency's discretion. For example, if an agency illegally promulgates a rule, a court can enjoin that rule without going through notice and comment rulemaking. Or if the Forest Service proceeds with a timber sale without consulting under Section 7, a court can enjoin that timber sale without preparing an environmental impact statement. And if the Bureau of Reclamation enters into water delivery contracts without complying with Section 7, a court can rescind those contracts, even if the Bureau could not withdraw from them. EPA's argument would extend beyond procedural violations of Section 7 to substantive ones as well. In the pesticide context, for example, if EPA authorized a pesticide use that would jeopardize the survival of a listed salmon population, EPA is arguing that the Court could not enjoin that pesticide use unless it replicated a FIFRA suspension hearing or unless it deferred to EPA to go through the cancellation or suspension process. And it's making that argument both in this harmonization argument and also in its exhaustion. Sotomayor It approved a pesticide that was – that should not have been approved. I would take it then the APA would have – would apply, perhaps, wouldn't it? It's actually – well, FIFRA has some procedures for challenging a registration, but the Endangered Species Act citizen supervision would allow a separate cause of action to enjoin the agency from going forward with an action that – In addition to – I mean, you're saying that these acts are parallel. They don't – it's not just a one or the other? Well, they are parallel. The APA – or the Administrative Procedure Act applies only if there is no other private remedy at law. The Endangered Species Act provides such a remedy and authorizes citizens to bring cases in courts to enjoin actions that cause jeopardy or actions proceeding without Section 7 consultation or actions that cause take of endangered species. In the Defenders of Wildlife case in the Eighth Circuit, that court upheld an injunction of a pesticide registration because it caused take of an endangered species. And the court held that the plaintiffs did not need to petition for cancellation of that pesticide or did not need to defer to EPA's cancellation proceedings to accomplish that result. And that makes sense because those proceedings are cumbersome. They take a lot of time. They wait until there's more evidence to be able to convince the administrative law judge to issue a particular ruling. And in the meantime, we could have jeopardy to these endangered species. And Congress wanted to make sure that would not occur. What's interesting about EPA's argument here, they argue that FIFRA is somehow unique because it's comprehensive, but many other statutes are comprehensive in governing the agency's behavior. They argue that it's unique because it references environmental duties and endangered species, but that's the case with our laws governing our national forests, fisheries management plans. It's not unique in that respect. The other statutory provision that EPA cites is the FIFRA suspension authority. And while there is a reference to the Endangered Species Act, EPA tries to read much more into that than is warranted. There was a conforming amendment in the Act that simply substituted the reference to the Endangered Species Act for its predecessor. And there's no legislative history, no indication that Congress meant to make that standard, the Endangered Species Act standard, that would govern a court. And the overriding defect in EPA's argument is that it is trying to transport limitations on an agency's authority into the courtroom. And it is trying to engraft those limitations under the court's exercise of its equitable power. But that is not how the equitable power has worked in the past. And in particular, with the exhaustion argument and the primary jurisdiction argument, EPA is asking that it be the judge of the remedy for its own breach of its duties under the Endangered Species Act. And that is inappropriate. I'd like to turn to two other arguments that have been made that go to the court's power to order injunctive relief. Both CropLife and the Farm Bureau have argued that the plaintiffs need to prove and the court needs to find that jeopardy would occur before an injunction can issue based on a procedural violation of Section 7. But that is not supported by this court's precedent. As long ago as Thomas v. Peterson, this court held that it is not the province of the courts to make that finding. Instead, the Endangered Species Act assigned that task to the fishery service, the Fish and Wildlife Service for terrestrial species, and the National Marine Fisheries Service for marine species, and made them the determinant of the harm to the species. Okay. Let me see if I understand, because we have so many orders and so many statutes and so many parties. The core problem with what the EPA did here, in your view, the core deficiency is the failure to consult. Is that the root of all of this? Or are there other things that the EPA did wrong that give rise to this suit in the first place? That is the sole claim that persists. That is the basis for the injunction. There was one other claim that was dismissed long ago. We did not appeal that. Okay. I'd like to turn now to Section 70. Both the Farm Bureau and CropLife have argued that Section 70 should govern this court's and the lower court's way that they address injunctive relief. This argument should be rejected for three reasons. First, it is another attempt to read into a restriction on an agency's authority some constraints on the court's equitable power. Section 70 imposes a prohibition on agencies. They are prohibited from engaging in irreversible and irretrievable commitments of resources during the consultation process. That's a prohibition on agencies. It is not a prohibition on the courts. It does not prescribe a standard governing injunctive relief that should be ordered by the courts. Second, Section 70 imposes an additional obligation on agencies. It was added in the wake of TVA v. Hill to prohibit agencies from engaging in preliminary steps such as spending money or entering into contracts that might create momentum towards finishing a project, even if that project is later found to cause jeopardy to an endangered species. In Connor v. Burford, this Court made it clear that Section 7D does not give an agency a license to violate Section 7A2. Instead, they are two complementary obligations that exist side by side. An agency cannot proceed with an action without engaging in Section 7 consultations, and it cannot proceed with an action that will jeopardize the survival of an endangered species. Those are the mandates in Section 7A2. The agency also cannot enter into contracts and make other irreversible kinds of commitments that could steamroll the project into completion, even if it should not go forward. And finally, in this case, the district court held that Section 7D was inapplicable, because Section 7D applies only once an agency has initiated consultation. And here, that is what the Court had ordered. EPA had not even requested consultation for most of the pesticides at issue, and there's a factual question of whether it has even initiated consultation at all. It's an issue the district court did not grapple with. It's not before this Court, but the district court did hold that Section 7D was inapplicable. To the extent that Ms. Bud Phelan has referred to the Southwest Center case, I want to point out that was withdrawn as moved, and it also said that Section 7D was not something that the agency would blindly apply at the injunction phase. I'd like to turn now to some of the arguments that have been made in terms of the propriety of the injunction that was issued. I will address the arguments that have been made orally, since many of the arguments in the brief were not reiterated here by Ms. Bud Phelan. She made two additional arguments. One was that the Court should have considered the economic impacts of the injunction. And while she concedes that TVA v. Hill and this Court's precedent have precluded that kind of balancing under the Endangered Species Act, she is inviting the Court to enter into that same kind of balancing through a back door.  That's entirely true, because in TVA v. Hill, it was an all-or-nothing proposition, whereas here we're not talking about a national ban on the use of pesticides. So it's inherent, isn't it, to take into account harm when fashioning an equitable decree? Well, in the motions she referred to in the district court, the evidence was very far-ranging and the request was very far-ranging, both to obtain a stay of the injunction altogether and to get rid of the buffers altogether. And that would be allowing the economic impacts to override the mandates of the Endangered Species Act and would be improper. What about the argument that you don't have to protect the waters when the fish aren't in them? That is an argument that was presented to Judge Kuhnauer, but it was presented in a slightly different way before the injunction was issued. CropLife, which was the only intervener block at that time, had argued that the injunction should apply only when salmon are present. And we argued that people don't know when the salmon are present if they've laid their eggs way underneath in the stream beds and that salmon are often coming and going, and so you can't really limit the period to a time when salmon are present. For example, coho salmon overwinter in the streams, so there are coho salmon in the streams year-round. Did the district court make a finding on that? At the December hearing, the district court indicated that he was going to have the order apply to streams where salmon are ordinarily present. I'd have to look at that interchange. I'm not sure if you could characterize his response to the arguments as a finding, but he clearly indicated he was going to go with streams where salmon are ordinarily present. I'm sorry, was this on a motion to modify the injunction further, or was it raised originally in connection with what should be the scope of that further injunction? It was raised before the injunction was issued and addressed by the judge at a status conference in December of 2003. It was also raised in the Farm Bureau's motion for a stay pending appeal. That ruling hasn't been appealed or that ordered, and that's post issuance of the injunction. So the only time it was raised and addressed in an issue that's on appeal properly before this court was prior to issuance of the injunction. On that particular issue, some of the language that had been proposed would have extended further to habitat that could have been used by salmon, and the judge refused to go that far and instead limited the injunction to waters ordinarily used by salmon, and then he referenced the identifications of those waters by the State Fish and Wildlife Agencies, which are what is embodied in the databases. I would submit that given the amount of dialogue on this issue and evidence that was presented to the district court on this issue, that he acted well within his discretion and did not abuse his discretion by adopting the definition he did. Can I ask one more question? Sure. Is the record clear either way, or is it in conflict as to the duration of these pesticides? In other words, do they dissipate immediately, or are there some long lasting effects? You know what I'm getting at? I'm not sure I'm expressing it correctly, but in terms of whether or not the injunction should be confined only to when salmon are actually present. The record does contain that information because we submitted EPA's risk assessments. We also submitted U.S. geological surveys where the USGS surveyed salmon waters and detected various pesticides. That was all before the court, but he did not tailor his injunction so that it applies only to one pesticide that's more persistent than another because he felt that would have put him in the shoes of the agencies in consulting as required by the Endangered Species Act. All right. Thank you. You're going to take the two minutes for rebuttal? Yes, please, Your Honor. Contrary to what Ms. Goldman suggests, we do not seek to make the ESA subservient in any way to FIFRA or any other statute. Rather, we are implementing this Court's own analysis of how Section 7 functions. The appellees simply don't confront the fundamental premises of our argument. FIFRA constrains EPA's discretion, and this Court has said that consultation obligations only go so far as discretion goes, and that makes perfect sense. If EPA can't take an action that enures to the benefit of a protected species, well, then, that should be relevant to asking what EPA should do for a protected species. And similarly, a district court should not have the authority to order EPA to take an action that violates another statute, which is, in essence, what the district court has ordered EPA to do here. For EPA to act, it has to have statutory authority to act. That's undisputed. Now, if we go a little further, I would just like to take a bit of issue with Ms. Golden's characterization of the record in this case, vis-à-vis harm to a particular fish. There is evidence in the record that there may be harm to these fish, but there's also, and it's shown by the district court's order, evidence that EPA has already determined that for many, if not most, of these pesticide-active ingredients at issue will have no effect or no likely adverse effect upon these species. The question is more the procedural part of things, not the overall harm thing. We don't challenge the district court's finding, of course, that there is a potential risk of harm. But I think that deserves emphasis. It is more about the consultation obligation and how best to achieve Congress's multiple goals in these separate but compatible enactments, the ESA and FFRA. But is there any dispute that there was no consultation? There is. We didn't put forth any evidence in the record that we had initiated. On this record, it's ‑‑ Right. I mean, there is a dispute about exactly what was necessary to satisfy EPA's duties under Section 782, but as to the formal and informal consultation, not that part. Okay. Thank you. Thank you. The case just argued is submitted for decision. That concludes the court's calendar for this morning. Court stands adjourned. All rise. This court for this session stands adjourned. This court is adjourned.
judges: Schroeder, Browning, Tashima